

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00130-CR

**ROBERT EARL JONES,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

## From the 85th District Court
### Brazos County, Texas
### Trial Court No. 11-03851-CRF-85

## MEMORANDUM OPINION

A jury found Appellant Robert Jones guilty of theft of property valued at more than $1,500 but less than $20,000 and assessed his punishment, enhanced by prior felony convictions, at twenty years' imprisonment. The trial court ordered that the sentence run consecutively to the sentence in his prior Harris County conviction. This appeal ensued.

On May 26, 2011, Matthew Shane Huggins, the general manager at College Station Pawn, received information that an individual who might commit a theft would

be coming into the store. Huggins told employee Phillip Ross to have the phone ready to contact the police if a theft did occur. In preparation, Huggins and Ross also left the jewelry case open and took pictures of some of the inventory.

Huggins notified Ross when the individual matching the description they had been given for the potential thief, later identified as Jones, entered the store. Ross went into the back of the store behind a two-way mirror overlooking the jewelry area and had the telephone ready to call law enforcement. Ross observed Jones walk over to the jewelry cases, open a case, and remove rings along with the ring holders. Jones reached into the case a second time and then made his way out the front door of the store without attempting to pay for the property.

Ross had called the police and was reporting what he was observing. College Station Police Officer Gary Southerland responded and saw Jones's vehicle hurriedly leaving the pawn shop parking lot such that Jones almost had an accident. Officer Southerland turned on his lights, and Jones stopped. When more law enforcement had arrived, Officer Southerland got Jones out of the car, and when Jones then buried his hands in his pockets, Officer Southerland patted him down. Officer Southerland observed a large lump in Jones's right front pocket. When Officer Southerland asked Jones what was in the pocket, Jones pulled out several rings that had price tags on them. Officer Southerland also discovered a ring display holder under the driver's seat of the vehicle and one in the glove box that still had a gold ring on it. In total, twelve rings were found in Jones's possession. Jones was arrested, and the rings were returned to College Station Pawn.

Donna Ruiz, the district manager for College Station Pawn, testified that twelve rings were taken on May 26, 2011. She said that if the store had sold all twelve rings, the total price would have been $4,499.91, which is the loss the store would have suffered because of the theft. Ruiz stated that even if the rings did not sell, however, and had to be sold for scrap, the gold from the rings alone was worth $1,700. Ruiz later explained that she had miscalculated and that the gold from the rings was worth $1,832 on May 26, 2011 even if the rings were scrapped. Ruiz also said that the diamonds from the rings have value apart from the gold. Ruiz testified:

> Q      [By Prosecutor] Is there any conceivable way, based on your 13 years in this industry, that College Station Pawn would have been out less than $1,500 if those rings had been lost and never recovered?
>
> A      No, sir, there's no way. It would be over 1500.
>
> Q      And at least $1,832 on May 26th, 2011?
>
> A      Minimal, yes, sir.

In his sole issue, Jones contends that the trial court erred in denying his request for an instruction on the lesser-included offense of theft of property valued at $500 or more but less than $1,500.

We use a two-step analysis to determine whether an appellant was entitled to a lesser-included-offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993). First, the lesser offense must be a lesser-included offense of the charged offense as defined by article 37.09 of the Code of Criminal Procedure. *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); *see* TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006). Article 37.09

provides:

> An offense is a lesser included offense if:
>
> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09.

The State concedes, and we agree, that the first step of the lesser-included-offense analysis is satisfied. The distinction between the offense for which Jones was charged (state jail felony theft) and theft of property valued at $500 or more but less than $1,500 (Class A misdemeanor theft) is merely the value of the property stolen. *Compare* TEX. PENAL CODE ANN. § 31.03(e)(3) (West Supp. 2013) *with id.* § 31.03(e)(4)(A). Class A misdemeanor theft is therefore a lesser-included offense of state-jail-felony theft. *Franklin v. State*, 219 S.W.3d 92, 96 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see* TEX. CODE CRIM. PROC. ANN. art. 37.09.

The second step of the analysis requires that there must be some evidence in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672-73. The evidence must be

evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser-included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or whether it conflicts with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536.

Jones argues that the second step of the lesser-included-offense analysis is satisfied because "there is a scintilla of evidence [sic] that the number of rings taken was less than twelve, and based on the testimony and common sense, if the jury believed that fewer than twelve rings were taken, the value would have been $1,500.00 or less." Jones states:

> Specifically, there was evidence that the number of rings taken was eight, based on State's exhibits three and four, and there was evidence that the number of rings taken was five or six, based on the testimony of Southerland and the recovery of the rings. The two employees who witnessed, recorded, and received the stolen rings back could not remember which rings were taken or what their value was.

State's Exhibit No. 3 is a photograph of six rings on a ring holder, and State's Exhibit No. 4 is a photograph of three more rings. Ruiz testified that all of the rings in State's Exhibit Nos. 3 and 4, except for one, were taken from the pawn shop on May 26, 2011. Ruiz thus agreed that State's Exhibit Nos. 3 and 4 together showed a total of eight rings that were taken. Ruiz never stated, however, that State's Exhibit Nos. 3 and 4 showed *all* of the rings that were taken. To the contrary, Ruiz consistently testified that, in all, a total of twelve rings were taken from the pawn shop that day.

Huggins testified as follows regarding State's Exhibit Nos. 3 and 4 and the number of rings that were taken:

Q     [By Defense Counsel]  Yesterday your regional manager, Ms. Ruiz, she came and testified; and some of the pictures were entered as exhibits.  I'm going to hand these to you.  Do you recognize those rings?

A     Yes, sir, I do.

Q     And did you make a picture of the -- did you make that picture, or who made that picture?

A     I believe this was a picture I'd taken.

Q     Okay.  Let me see.  And -- so the three rings we see here on State's Exhibit 4, are these rings that were recovered later on?

A     I believe -- at least one or two of them.  I don't remember, being a couple of years, exactly which rings were taken from the store.

Q     Okay.

A     But I, you know -- I'm unsure if they all were, but I know that a couple of those were involved.  At least one or two of those were involved.

Q     And then what we see in State's Exhibit 3, the same question:  Were these the same exact rings that were taken and recovered?

A     Like I said, again, it's been so long, I don't remember -- they were all yellow gold rings, but I don't remember the exact descriptions. We had taken basically quite a few photos of the case.  So I'm unaware if all of those were involved.

Q     Okay.  And you were the one actually at the store; correct? That day?

A     I was, yes, sir.

Q     And you're the one that took the pictures or -- you had access to what was being recovered; correct?

A    That is correct.

Q    And y'all recovered all the rings; correct?

A    That is correct.

Q    Okay.  But your testimony [is that] some of the rings might not have been taken?

A    I'm -- like I said, it's been a couple of years since the incident so, you know, there's quite a few yellow gold rings.  I couldn't tell you.  You could probably talk to somebody associated with the store that has [a] record of that.  They would probably be able to further assist you on that.

….

Q    Safe to say -- earlier you testified that some of the rings may or may not be part of what was recovered?

A    I'm unaware -- like I've said over -- it's been a couple of years.  I'm no longer employed there.  So I'm unaware.  Like I said, you might talk to the district manager who would definitely -- should have that information, but I'm unaware --

Q    Okay.

A    -- of exactly which rings were stolen.

….

Q    … And what we have here is State's Exhibit 3 and 4.  This one encompasses some of the items that may or may not have been taken?

A    That's correct.

….

Q    [By Prosecutor]  All right.  At the time of this theft did you do a receipt showing the values of the items that were taken?

A    That's correct.

Q    Okay.  Going to direct your attention to State's -- I believe

this is State's 2.  The values we see assigned to this property, is that what College Station Pawn would have sold them for?

A     That is correct.

Q     Okay.  And those were -- and these were the prices assigned to this jewelry on the day this theft took place; correct?

A     That is correct.

Q     And this would list each and every item that was taken on that day; correct?

A     That is correct.

….

Q     [By Defense Counsel]  What the State just showed you was a receipt that's broken into two parts; correct?

A     That is correct.

Q     Have you had a chance to count the items that are on this receipt?

A     Have I?  No.  I can do that.

Q     Do that real quick.

A     Looks to be 12 items.

Q     Okay.  And let's -- you can keep holding that.  And let's correspond that to State's Exhibit 3 and 4.  How many items are on those pictures?

A     There are nine items on that picture.

Q     Okay.  So if we have 12 items there and 9 items on the picture, is it safe to say that some of those items on the receipt were not recovered that particular day?

A     No, sir, that's not safe to say.

Q      So why did you not take a picture of all the items?

A      Basically we have a large jewelry case.  There are quite a bit of rings in there so I -- I didn't take a picture of every single ring we had in the store.

….

Q      Okay.  And these pictures correspond to the items that were recovered; correct?

A      I'm unsure if those pictures were taken before or after the theft occurred.

Q      Well, I'm -- I'm confused then.  Why would we have pictures of items that might not have been taken?

A      Because we were -- we thought -- we were -- suspected that there would be a theft occurring by that – by the defendant that day.

Q      So you just went in there and started taking pictures of the rings?

A      Of the nearest case, yes, sir.  To the first available case basically.

Q      So we don't know if these rings were taken or not?

A      Like I said, as of now, I couldn't tell you.  It's, you know -- my memory hasn't been refreshed on the exact rings that were taken, but they possibly could have.

Huggins therefore repeatedly testified that he did not know which rings were taken and that, more specifically, he did not know which rings in State's Exhibits Nos. 3 and 4 had been taken.  He stated that a current employee like the district manager would be in a better position to answer those questions.  The only affirmative evidence provided by Huggins of the number of rings taken in the theft was that, on the day of the theft, he made a receipt showing the values of every item that was taken (State's

Exhibit No. 2) and that the receipt had a total of twelve items listed on it. Ross testified similarly to Huggins with regard to State's Exhibit Nos. 3 and 4 and the number of rings that were taken in the theft.

Finally, Officer Southerland testified as follows regarding the number of rings that were taken in the theft:

> Q    [By Prosecutor]  So when you pat him down -- and we'll get back to where I was -- did you actually feel something in the pocket?
>
> A    Yeah, there was a large lump -- there was something in his front right pocket. It was stuffed full. I hadn't really -- no idea what all it could be.
>
> Q    So originally are you still trying to determine if he has some weapon that can hurt you?
>
> A    Yes, sir.
>
> Q    And in doing that -- when he pulled stuff out of the pocket, what came out?
>
> A    As soon as he reached -- after I asked him what that lump was, he pulled out -- there were several rings -- like four or five rings that he pulled out with the price tags on them.
>
> ….
>
> Q    Okay. And I'll show you State's Exhibit No. 4. Is this representative of what he pulled out of his pocket?
>
> A    Yes, sir. They all looked similar to that. All tagged exactly like that.
>
> ….
>
> Q    After placing the defendant under arrest, did you have an opportunity to inventory the inside of the car before you had the car towed?

A      Yes, sir.

Q      And did you find anything else that is relevant to this particular theft?

A      Yes.  The ring holders which if you saw on the video -- he made a movement to go to his car to get them to show them to us, they were all inside the vehicle underneath the passenger seat and the glove box.

Q      Showing you State's Exhibit No. 3.  Is this the type of ring holder that was found?

A      Yes, sir.  Yeah, there were several of those.

Q      And if you refresh your memory from your report, one -- where were they exactly found in the car?

A      It says, "I then inventoried the vehicle and discovered both of the ring display holders, one under the driver's seat and one in the glove box.  One gold ring was still found on the one in the glove box."

Q      So you had an empty ring holder under the driver's seat?

A      Yes.

Q      And then you had a ring holder that had -- was empty except for one ring in the glove compartment?

A      Yes, sir.

….

Q      Did you have an opportunity then to determine just how many rings were in the defendant's possession on that day?

A      Yes, sir.  I have to check the list.  Fairly significant.

Q      How many rings were there?

A      Twelve, it appears.  Yeah.  Confirmed it by counting each one.

….

> Q … [U]sing your report to refresh your memory, are the rings depicted in State's Exhibit No. 2 the exact same 12 rings you found on the defendant and were returned to College Station Pawn by the police department?

> A Yes, sir, they are.

Officer Southerland therefore testified that when he asked Jones what the lump was in his right front pocket, Jones pulled four or five rings out of the pocket. Officer Southerland later stated that he found one ring in the car on a ring holder in the glove compartment. But Officer Southerland never stated that these were all the rings that he found in Jones's possession. In fact, Officer Southerland said on cross-examination that after Jones removed the several rings from his right front pocket along with "a lighter and cigarettes or something," Officer Southerland asked Jones to empty the rest of the contents from all of his pockets, but Officer Southerland never stated how many rings were found in those pockets. The only affirmative testimony provided by Officer Southerland of the number of rings taken in the theft was that he found a total of twelve rings in Jones's possession on the day of the theft and that the twelve rings he found in Jones's possession were returned to the pawn shop and match the twelve rings depicted in the receipt made by Huggins (State's Exhibit No. 2).

Based on the foregoing, we conclude that there is not more than a scintilla of evidence that the number of rings taken was less than twelve and therefore that the value of the rings could have been less than $1,500. *See Dobbins v. State*, 228 S.W.3d 761, 768 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd) ("It is not enough that the jury

disbelieves evidence pertaining to the greater offense; there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.") (citing *Hampton v. State*, 109 S.W.3d 437, 440-41 (Tex. Crim. App. 2003)). The second step of the analysis is thus not satisfied because there is not more than a scintilla of evidence in the record that would permit a jury to rationally find that if Jones is guilty, he is guilty only of Class A misdemeanor theft. *See Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741; *Rousseau*, 855 S.W.2d at 672-73. The trial court did not err in denying Jones's request for an instruction on the lesser-included offense of Class A misdemeanor theft. We overrule Jones's sole issue and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed July 3, 2014
Do not publish
[CR25]