ACCEPTED
03-14-00637-CR
5006955
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/23/2015 1:53:06 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00637-CR**

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/23/2015 1:53:06 PM
JEFFREY D. KYLE
Clerk

_____

On Appeal from the 403rd Judicial District Court of
Travis County, Texas
Cause Number D-1-DC-12-302227

_____

**CHRISTOPHER ROBERTS, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

*Counsel for Appellant*
*Christopher Roberts*

**KRISTEN JERNIGAN**
ATTORNEY AT LAW
STATE BAR NUMBER 90001898
207 S. AUSTIN AVE.
GEORGETOWN, TEXAS 78626
(512) 904-0123
(512) 931-3650 (FAX)
Kristen@txcrimapp.com

**ORAL ARGUMENT REQUESTED**

## IDENTIFICATION OF PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, a complete list of the names of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of this case.

**Appellant:**

Christopher Roberts

**Counsel for Appellant**:

William J. Browning (at trial)          Guillermo Gonzalez (at trial)
811 Nueces                              700 Lavaca St., Suite 405
Austin, Texas 78701                     Austin, Texas 78701

Matthew Dorsen (at trial)               Kristen Jernigan (on appeal)
700 Lavaca Street                       207 S. Austin Ave.
Austin, Texas 78701                     Georgetown, Texas 78626

**Counsel for Appellee, The State of Texas:**

Rosemary Lehmberg
Travis County District Attorney

Maria Deford
Anna Lee McNelis
Joe Frederick
Assistant District Attorneys
509 W. 11th Street
Austin, Texas 78701

**Trial Court Judge:**

The Honorable Brenda Kennedy

# **TABLE OF CONTENTS**

IDENTIFICATION OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    1.     The trial court abused its discretion in denying Appellant's requested jury instruction on the lesser-included offense of manslaughter.

    2.     The trial court abused its discretion in allowing a detective to give his opinion that Appellant committed the offense of murder without any personal knowledge of that alleged fact.

    3.     The evidence is insufficient to support Appellant's conviction.

    4.     The prosecutor unfairly argued outside the bounds of the proper areas of argument during closing statements.

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

# INDEX OF AUTHORITIES

## CASES

*Aguilar v. State*, 682 S.W.2d 556 (Tex. Crim. App. 1985) . . . . . . . . . . . . . . . . . . . 9

*Arnold v. State*, 853 S.W.2d 543 (Tex. Crim. App. 1993) . . . . . . . . . . . . . . .18, 21

*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . 24

*Cannon v. State*, 668 S.W.2d 401 (Tex. Crim. App. 1984) . . . . . . . . . . . . . . . . 24

*Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. 1994) . . . . . . . . . . . . . . . . . .17

*Bignall v. State*, 887 S.W.2d 21 (Tex. Crim. App. 1994) . . . . . . . . . . . . . . . .10, 16

*Boyde v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974) . . . . . . . . . . . . . . . . . . 18

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . .22, 23

*Cardenas v. State*, 30 S.W.3d 384 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . .9

*Dobbins v. State*, 228 S.W.3d 761 (Tex. App.—Houston [14th Dist.] 2007) . 10, 16

*Fairow v. State*, 943 S.W.2d 895 (Tex. Crim. App. 1997) . . . . . . . . . .17, 18, 21, 23

*Felder v. State*, 848 S.W.2d 85 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . . 23, 31

*Flores v. State*, 245 S.W.3d 432 (Tex. Crim. App. 2008) . . . . . . . . . . . . . . . . . . . 9

*Forest v. State*, 989 S.W.2d 365 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . 10, 16

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . 22

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

*Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . 8

*Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . . .19

*Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . 19

*King v. State*, 953 S.W.2d 271 (Tex. Crim. App. 1997) . . . . . . . . . . . . . .21, 30, 31

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . .21, 30

*Lum v. State*, 903 S.W.2d 365 (Tex. App. -- Texarkana 1995) . . . . . . . . . . . . . 18

*Makeig v. State*, 802 S.W.2d 59 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . . . . . 8

*McMillan v. State*, 754 S.W.2d 422 (Tex. App. -- Eastland 1988) . . . . . . . . . . . 17

*Megan Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013) . . . . . . . . . . . 22

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) . . . . . . . . . . . . . 19

*Nejnaoui v. State*, 44 S.W.3d 111 (Tex. App.—Houston [14th Dist.] 2001) . .19, 20

*Rousseau v. State*, 855 S.W.2d 666 (Tex. Crim. App. 1993) . . . . . . . . . . . . .7, 9, 16

*Royster v. State*, 622 S.W.2d 442 (Tex. Crim. App. 1981) . . . . . . . . . . . . . 7, 9, 16

*Saunders v. State*, 840 S.W.2d 390 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . 10

*Spaulding v. State*, 505 S.W.2d 919 (Tex. Crim. App. 1974) . . . . . . . . . . . . . . . 18

*State v. Kurtz*, 152 S.W.3d 72 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . 8

*Stobaugh v. State*, 421 S.W.3d 787 (Tex. App.—Fort Worth, 2014) . . . . . . . . . .22

*Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000),
        *cert. denied*, 532 U.S. 944 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## STATUTES AND RULES

TEX. CODE CRIM. PRO. Art. 37.09 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

TEX. PENAL CODE § 6.03(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. PENAL CODE § 19.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TEX. PENAL CODE § 19.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

TEX. R. APP. 44.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

TEX. R. EVID. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

TEX. R. EVID. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 39.1, Appellant requests oral argument in this case.

No. 03-14-00637-CR

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

_____

On Appeal from the 403rd Judicial District Court of
Travis County, Texas
Cause Number D-1-DC-12-302227

_____

**CHRISTOPHER ROBERTS, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

**STATEMENT OF THE CASE**

On January 22, 2013, Appellant was indicted for the felony offense of murder. (CR: 16). On September 26, 2014, a jury found Appellant guilty of the offense of murder as alleged in the indictment. (CR: 242, 258). The jury assessed Appellant's punishment at fifty years in prison. (CR: 246, 258). Appellant timely filed Notice of Appeal on September 29, 2014.[1] (CR: 253). This appeal results.

_____

[1] Once the undersigned was appointed, the undersigned filed Notice of Appeal on October 3, 2014 as well. (CR: 255).

1

## STATEMENT OF FACTS

At trial, Kevin Garvey of the Austin Police Department told the jury that on November 15, 2012, he was dispatched to a call regarding a possible deceased person. (RR8: 24-25). When Garvey arrived at the location, a home shared by Appellant and his roommates, Garvey encountered roommate Michael Orf. (RR8: 27). Once inside, Garvey found a deceased person inside and identified her as Kirstin Anderson. (RR8: 28). While Garvey and other officers investigated, Appellant was transported to the Police Department to be interviewed. (RR8: 32-33). Appellant returned later and waited outside in Garvey's patrol car while Garvey and the other officers on scene completed their investigation. (RR8: 32-33). On cross-examination, Garvey acknowledged that EMS had responded earlier to Appellant's home, but Orf told them they were not needed and he did not understand why they were there. (RR8: 37-38).

Jack Perkins with the Austin Police Department related that on November 14, 2012, he responded to a call at the home Appellant shared with Orf and other roommates. (RR8: 45). One of the roommates, Nora Holland, called 911 and indicated that she might commit suicide. (RR8: 45-46). Ultimately, Holland was transported to the hospital. (RR8: 45-46). The next day, Perkins responded to the call at Appellant's home and during the investigation of Anderson's death,

2

transported Appellant to the Police Department to be interviewed. (RR8: 52). On cross-examination, Perkins stated that on November 14, 2012, Holland was in distress and Appellant was attempting to care for her. (RR8: 53-54).

Jason Hallmark of the Austin Police Department explained that on November 15, 2012, he responded to a 911 call of a person not breathing. (RR8: 58). When he arrived, Hallmark encountered Appellant who was in a bedroom with Garvey and Anderson and was trying to determine what had happened to Anderson. (RR8: 58-59). Hallmark directed Appellant out to the living room and Appellant looked as if "he was like in shock." (RR8: 60).

Derek Israel, a detective with the Austin Police Department, stated that he arrived at Appellant's home on November 15, 2012, to determine the manner of Anderson's death. (RR8: 79-80). Israel told the jury that he found some bruising on Anderson's body as well as a fingernail mark. (RR8: 90-91). Israel expressed an opinion that Anderson may have been choked or strangled. (RR8: 108). Israel was shown photographs which, in his opinion, reflected a small injury to Appellant's hand and some stains on a portion of his shirt. (RR8: 119-21). On cross-examination, Israel agreed that the police are called to every non-hospice related death and that simply because they respond to a death scene, it does not mean a murder has necessarily occurred. (RR8: 126). Israel also

3

agreed that he could not conclude Anderson's or Appellant's apparent injuries were caused by a struggle. (RR8: 130). Israel stated further that the "injuries" on Appellant's hand were "small, a millimeter, two millimeters" and that he had "no idea" how they came about. (RR8: 132).

Leisha Wood with the Travis County Medical Examiner's Office expressed her opinion that Anderson died at least twelve hours before police responded to her home on November 15, 2012, and that her death could have occurred as early as the night of November 14, 2012. (RR8: 177). Wood expressed further that Anderson's cause of death was strangulation. (RR8: 183). The toxicology examination of Anderson showed she had marijuana metabolites in her blood and a blood alcohol content of .36. (RR8: 188). On cross-examination, Wood admitted that if a person was put in a choke hold for thirty seconds they would appear to be sleeping but could die later. (RR8: 192). Additionally, a high blood alcohol content, like that found in the toxicology examination of Anderson, could impact that chance of survival negatively. (RR8: 192). Wood was also forced to acknowledge that Anderson's death was caused by lack of blood to the brain, not an obstructed airway. (RR8: 194).

Claire McKenna, a DNA technician with the Austin Police Department, stated that she tested fingernail swabs from both Appellant and Anderson, a neck

4

swab from Anderson, and a stain on Appellant's shirt. (RR9: 25). The fingernail swab from Appellant's right hand indicated only his own DNA, and not that of Anderson. (RR9: 27). The swab taken from Anderson's right fingernail indicated a mixture of DNA samples which could have included several different contributors, but Appellant and Anderson could not be excluded as contributors. (RR9: 28). However, McKenna testified that Appellant's DNA could be under Anderson's fingernail because they lived together. (RR9: 29). The fingernail swab from Anderson's left hand also indicated a mixture of potentially many DNA profiles, but Appellant and Anderson could not be excluded as contributors. (RR9: 30). McKenna was careful to point out that regarding all of her tests, she could not testify Appellant's DNA appeared on any of the samples; but rather, could only express her opinion as to the possibility his DNA profile could be excluded or included. (RR9: 32). McKenna then stated that Anderson could not be excluded as a contributor to the DNA found on Appellant's shirt but could not say that the DNA found came from the stain on Appellant's shirt. (RR9: 47). In fact, McKenna only did a presumptive test for blood and not a confirmatory test. (RR9: 47). Finally, McKenna indicated that Appellant was excluded as a contributor to the DNA found on Anderson's neck. (RR9: 36). On cross-examination, McKenna admitted that she did not conduct further testing on

5

the swabs from Anderson's fingernails that indicated multiple contributors to determine who those contributors were. (RR9: 58-59).

William White with the Austin Police Department told the jury that on November 15, 2012, he responded to the scene of Anderson's death. (RR9: 72). As part of his investigation he interviewed Appellant at the Police Department. (RR9: 80). The jury was then shown a video recording of that interview. (RR9: 80). During the interview, Appellant related that he left for work on the morning of November 15, 2012, and Anderson was snoring in the bed next to him. (RR11: 18). When he returned home at 5:00 p.m., he found her not moving so he grabbed a cell phone, called 911, and did CPR until the paramedics arrived. (RR11: 19). Appellant indicated that the night before, he had had to restrain Anderson with a form of a choke hold to calm her down. (RR11: 28, 30). Appellant explained that Anderson had been drinking heavily and often became out of control. (RR11: 29-30). White stated that he spoke with Appellant again in Garvey's patrol car outside Appellant's home. (RR9: 89). White then interviewed Appellant again while he was in custody at the Del Valle Correctional Complex shortly after he was arrested. (RR9: 109). Based on that interview, White was allowed to testify, over Appellant's objection that it was his opinion that Anderson's death was a "straightforward murder." (RR9: 111). At the

6

close of White's testimony, both sides rested and closed.    (RR9: 125).

## ISSUES PRESENTED

1.      The trial court abused its discretion in denying Appellant's requested jury instruction on the lesser-included offense of manslaughter.

2.      The trial court abused its discretion in allowing a detective to give his opinion that Appellant committed the offense of murder without any personal knowledge of that alleged fact.

3.      The evidence is insufficient to support Appellant's conviction.

4.      The prosecutor unfairly exceeded the bounds of the proper areas of argument during closing statements.

## SUMMARY OF THE ARGUMENT

Appellant's first point of error should be sustained because the trial court abused its discretion in denying Appellant's requested jury instruction on the lesser-included offense of manslaughter where Appellant met the required two-prong test set forth in *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981). Appellant's second point of error should be sustained because the trial court abused its discretion in allowing a detective to give his opinion that Appellant committed the offense of murder without any personal knowledge of that alleged fact and the detective's opinion supplanted that of the jury's.   Appellant's third point of error should be sustained because the evidence is insufficient to support

7

Appellant's conviction for murder when the State failed to prove the requisite mental state for that offense. Appellant's fourth point of error should be sustained because the prosecutor unfairly exceeded the bounds of the proper areas of jury argument by infusing facts not testified to at trial during closing statements which resulted in a violation of Appellant's substantial rights, including the right to a fair trial.

## ARGUMENT & AUTHORITIES

I.     ***The trial court abused its discretion in denying Appellant's requested jury instruction on the lesser-included offense of manslaughter.***

Appellant's first point of error should be sustained because the trial court abused its discretion in denying Appellant's request for a jury instruction on the lesser-included offense of manslaughter. A trial court's decision regarding the submission of a lesser-included offense is reviewed for an abuse of discretion. *Jackson v. State*, 160 S.W.3d 568, 575 (Tex. Crim. App. 2005). A trial court abuses its discretion when its decision is arbitrary, unreasonable, or without reference to guiding rules or principles. *Makeig v. State*, 802 S.W.2d 59, 62 (Tex. Crim. App. 1990). A trial court also abuses its discretion when it fails to analyze the law correctly and apply it to the facts of the case. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

A two-prong test is applied to determine whether a defendant is entitled to an instruction on a lesser-included offense. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981). First, the lesser-included offense must be included within the proof necessary to establish the charged offense. *See* TEX. CODE CRIM. PRO. Art. 37.09; *Flores v. State*, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008). Second, some evidence must exist in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty of only the lesser-included offense. *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985).

Manslaughter is a lesser-included offense of murder. *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). Thus, the first prong of the required test is satisfied.

As for the second prong, a person commits manslaughter if he recklessly causes the death of an individual. TEX. PENAL CODE § 19.04. A person acts recklessly if he engages in conduct and is aware of but consciously disregards a substantial and unjustifiable risk associated with that conduct. TEX. PENAL CODE § 6.03(c).

Anything more than a scintilla of evidence is sufficient to entitle a defendant to a charge on the lesser-included offense. *Dobbins v. State*, 228 S.W.3d 761,

9

768 (Tex. App.—Houston [14th Dist.] 2007). A trial court is not permitted to consider the weight or credibility of the evidence, or whether it conflicts with other evidence. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). Regardless of its strength or weakness, if the evidence establishes the lesser-included offense as a "valid, rational alternative to the charged offense," then the charge must be given. *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999); *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994).

In this case, at the close of testimony, Appellant objected to the jury charge and requested an instruction on the lesser-included offense of manslaughter. (RR9: 127-34). Counsel argued that an interview between Detective White and Appellant raised the issue of whether Appellant's conduct was reckless or intentional. (RR9: 130-34). Specifically, counsel argued that if guilty, there was evidence that Appellant may have recklessly caused Anderson's death. (RR9: 133).

The record reflects that during Appellant's first interview with White, he explained that on the night of November 14, 2012, he had had to restrain Anderson with a form of a choke hold to calm her down. (RR11: 28, 30). Appellant informed White that Anderson had been drinking heavily and often became out of control. (RR11: 29-30). In response to Appellant's comments, White

10

repeatedly theorized that Appellant's acts were reckless, rather than intentional or knowing. During Appellant's first interview, the following exchange occurred between White and Appellant:

DET. WHITE: Well... again that's not saying that you meant to harm her.

APPELLANT: Right.

DET. WHITE: You know? This could have been something totally accidental, alright? You mentioned she does like to be strangled... during... and she gets off on that sort of thing. It doesn't take much to actually render a person unconscious when they're in a choke hold.

DET. WHITE: Yeah, especially if they're been drinking and it doesn't take much to knock them out normally. Nor does it take much after they're knocked out to actually cause enough damage from them to even be awake for a little bit, but then subsequently die or even to do it long enough where they actually die. We've seen cases where somebody gets strangled for long enough that they pass out and they don't ever come to and they'll stay breathing for you

11

know sometimes minutes, sometimes hours and days before they... the lack of oxygen and amount of damage caused because of the strangulation eventually causes their brain to shut down. So...

(RR11: 41).

In Appellant's second statement, White again contemplated the issue of intent.

DET. WHITE:    Yeah, you know, and there's a big difference between someone that goes out and intentionally wants to kill somebody and somebody who gets involved in a situation and just gets a little beyond their control. And they don't necessarily intend that outcome but sometimes things get out of control and, you know, mistakes happen. I've certainly made my fair share in my life and...

(RR11: 49).

In the third statement, White again raised the issue:

DET. WHITE:    OK. Well as far as, uhh... Why it's 1st degree murder, uhh... There's two reasons they wanna charge you with

1st degree murder, uhh... It's called, what's called intentionally causing someone's death and knowingly causing someone's death. ***Like I talked to you before, whether or not you intended to kill her, I can see that you probably did not.***

(RR11: 56) (emphasis added).

White continued:

DET. WHITE:     Whatever the case may is, or if you're just trying to calm her down. Whatever the case is, people can sometimes let things go a little farther than they meant to. That's what I was saying, you know, it's possible that you hit it harder than you normally do, and that's what ultimately caused this. That's... that's understandable. That's... that's something that I think anybody can see happening.

APPELLANT:     But you, but you charged me with 1st degree murder which is intentional.

DET. WHITE:     It's intentional or knowingly. Intentional means, and it's complicated, its legal means. Intentional is like what you... were... what you're thinking in your mind. You're

13

right. Intentional means I'm gonna go kill that person, I want them dead. OK?

APPELLANT: [not audible]

DET. WHITE: Knowingly means something different. Knowing can mean, OK, I take a gun out and I'm gonna try to scare you. So, I'm gonna shoot it right at you, but then I end up shooting you. Well, I should have known that by doing this act, shooting a gun at somebody is clearly dangerous and can cause them, cause death to them.

APPELLANT: That's the issue I'm having problems with... [not audible]... I don't know. I don't know. I thought that was way less harmful than a choke... my arm... her arm. You know? (RR11: 59).

DET.WHITE: Yeah, and don't. I don't believe, I believe you're not a cold blooded murderer and I talked to you about that at our first interview, was I don't think you're a serial killer. I don't think your goal that night was to go out and murder your girlfriend or anything like that. *I think it was a situation that got, that went beyond what you*

14

**meant it to.**

(RR11: 60) (emphasis added).

DET. WHITE:    Mmm. Well again, like what we talked about, there's a...There's a difference between going out and intentionally killing someone and then just, in the heat of the moment, things going too far. Uhh... Now, what you what you were saying as far as, you know, *I can see it being manslaughter versus murder.* That is something you can discuss, you know, that's something you can talk to the prosecutors about, with your attorney about.

(RR11: 63).

Appellant indicated to White that he put Anderson in a choke hold to restrain her after she had become out of control after drinking heavily.  The medical examiner testified that if a person was put in a choke hold for thirty seconds they would appear to be sleeping but could die later and that a high blood alcohol content, like the .36 level found in the toxicology examination of Anderson, could impact that chance of survival negatively.   Therefore, the act of putting someone in a choke hold could be considered a reckless act.

15

Further, the State's own witness repeatedly raised the issue of whether if Appellant was guilty, he could be guilty only of the lesser-included offense of manslaughter. White even went so far as to say, "I can see it being manslaughter versus murder" and "Like I talked to you before, whether or not you intended to kill her, I can see that you probably did not." The video and audio recordings of Appellant's statements were played before the jury and admitted into evidence in Appellant's trial and are more than a scintilla of evidence that if Appellant was guilty, he was guilty only of the offense of manslaughter. *See Dobbins*, 228 S.W.3d at 768. Thus, the issue of whether Appellant acted recklessly was undoubtedly raised at trial as a "valid, rational alternative to the charged offense." *See Forest*, 989 S.W.2d at 367; *Bignall*, 887 S.W.2d at 23. As such, the trial court was required to instruct the jury on the lesser-included offense of manslaughter. *Id.*

Appellant has met the requirements of the two-prong test as set forth in *Rousseau* and *Royster,* for showing he was entitled to a jury instruction on the lesser-included offense of manslaughter. *Rousseau*, 855 S.W.2d at 672; *Royster,* 622 S.W.2d at 444; *Dobbins*, 228 S.W.3d at 768. Therefore, the trial court was required to give Appellant's requested instruction and abused its discretion in failing to do so. *Forest*, 989 S.W.2d at 367; *Bignall*, 887 S.W.2d at 23.

16

Accordingly, Appellant's first point of error should be sustained.

**II.** ***The trial court abused its discretion in permitting the lead detective in this case to give his opinion that Appellant committed murder when he had no personal knowledge upon which to base his opinion.***

The trial court abused its discretion in allowing the lead detective in this case, who was not present when Anderson died, to give an opinion that Appellant intentionally caused her death. The trial court's ruling allowing this opinion testimony, over Appellant's objection, was an abuse of discretion because the detective had no personal knowledge upon which to base his opinion and because the investigator's opinion supplanted the jury's determination of guilt or innocence.

Texas Rule of Evidence 701 states that a lay witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. TEX. R. EVID. 701. The initial requirement that an opinion be rationally based on the perceptions of the witness is composed of two parts. *Fairow v. State*, 943 S.W.2d 895, 899-900 (Tex. Crim. App. 1997). "First, the witness must establish personal knowledge of the events from which his opinion is drawn and, second, the opinion drawn must be rationally based on that knowledge." *Id.* Accordingly,

17

the proponent of lay-opinion testimony must establish that the witness has personal knowledge of the events upon which his opinion is based. *Id.* If the proponent of the opinion cannot establish personal knowledge on the part of the testifying witness, the trial court should exclude the testimony. *Id.*; *see also Bigby v. State*, 892 S.W.2d 864, 889 (Tex. Crim. App. 1994); *McMillan v. State*, 754 S.W.2d 422, 425 (Tex. App. -- Eastland 1988) (holding that a lay-witness opinion based on hearsay was inadmissible). It is impossible for a witness to possess personal knowledge of what someone else is thinking because that individual is the only one who knows for certain the mental state with which he or she is acting. *Fairow*, 943 S.W.2d at 899-900; *see also Arnold v. State*, 853 S.W.2d 543, 547 (Tex. Crim. App. 1993). "Therefore, if the trial court determines that a proffered lay-witness opinion is an attempt to communicate the actual subjective mental state of the actor, the court should exclude the opinion because it could never be based on personal knowledge." *Fairow*, 943 S.W.2d at 900. Moreover, if the witness's lack of personal knowledge yields testimony that amounts to an opinion of guilt or innocence, the opinion should be excluded. *Fairow*, 943 S.W.2d at 900; *see also Boyde v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974); *Spaulding v. State*, 505 S.W.2d 919 (Tex. Crim. App. 1974).

18

The second requirement for admissibility under rule 701 is that the opinion be helpful to the trier of fact to either understand the witness's testimony or to determine a fact in issue. TEX. R. CRIM. EVID. 701.   A lay witness's opinion as to a mental state is properly excluded when the witness has not been qualified as an expert or shown to know the legal definition of said mental state.  *Fairow v. State*, 943 S.W.2d at 900; *see also Lum v. State*, 903 S.W.2d 365, 370 (Tex. App. -- Texarkana 1995).

To be admissible, expert testimony must "assist" the trier of fact and be both reliable and relevant to help the jury in reaching accurate results. TEX. R. EVID. 702; *Jordan v. State*, 928 S.W.2d 550, 553- 54 (Tex. Crim. App. 1996); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992).   An expert's testimony must aid, but not supplant the jury's decision.  *Nejnaoui v. State*, 44 S.W.3d 111, 117 (Tex. App.—Houston [14th Dist.] 2001).   The trial court's ruling on the admissibility of opinion testimony is reviewed under an abuse of discretion standard.  *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990).

Detective White interviewed Appellant while he was in custody at the Del Valle Correctional Complex shortly after he was arrested.  (RR9: 109).   Based on that interview, White was allowed to testify, over Appellant's objection that it was his opinion that Anderson's death was a "straightforward murder."  (RR9:

19

111).   This line of opinion testimony continued with the following:

THE PROSECUTOR:   So based on what you had at the time, why did you charge the defendant with murder?

DET. WHITE:   The law says that murder is intentionally or knowingly. Based on the totality of the circumstances, the evidence we had at the time, the investigation, what forensics we did have, including the medical examination, and ultimately the defendant's own statements, I felt that his conduct was not only knowing but intentionally done.

(RR9: 114).

White was not qualified as an expert and therefore, his testimony was that of a lay witness.   TEX. R. EVID. 701.   White was not present when Anderson died and therefore, his opinion that Appellant committed the offense of murder was not based on his personal knowledge or rational perception of any event.   *Fairow*, 943 S.W.2d at 899-900.   Further, White could never have possessed personal knowledge of Appellant's mental state, which White testified was knowing and intentional.   *Fairow*, 943 S.W.2d at 899-900; *Arnold*, 853 S.W.2d at 547.   Since

20

White's opinion was an attempt to communicate Appellant's actual subjective mental state, namely that he intentionally and knowingly killed Anderson, it should have been excluded, especially since that opinion was an ultimate opinion of guilt or innocence. *Fairow*, 943 S.W.2d at 900.

Further, White's opinion was not helpful to the jury because it did not assist the jury in determining an issue of fact and instead, supplanted the jury's ultimate decision of whether Appellant was innocent or guilty. TEX. R. EVID. 702; *Nejnaoui*, 44 S.W.3d at 117.

Appellant was harmed by the trial court's erroneous ruling allowing the admission of White's opinion because Appellant's substantial rights, including his right to a fair trial, were affected. TEX. R. APP. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997), *citing Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Clearly, the admission of White's opinion that Appellant acted intentionally and knowingly, and therefore, murdered Anderson affected the jury's verdict. This was the State's only evidence that Appellant acted intentionally and knowingly,[2] and

---

[2] Appellant anticipates that the State will argue Appellant confessed to intentionally causing Anderson's death based on statements Appellant made during his third interview with White. *See* (RR11: 64, 68). However, the record reflects that Appellant's statements regarding what could have happened on the night Anderson died were speculation and "for the sake of this

21

therefore, necessarily affected the outcome of Appellant's trial. *See King*, 953 S.W.2d at 271.

The trial court abused its discretion in allowing opinion testimony where White had no personal knowledge to give that opinion and Appellant was harmed by that admission. *See Montgomery*, 810 S.W.2d at 379; *King*, 953 S.W.2d at 271. That being the case, Appellant's second point of error should be sustained.

### III. *The evidence is insufficient to show Appellant committed the offense of murder.*

The Court of Criminal Appeals has held that the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 320 (1979), is the only standard that a reviewing court should apply when determining the sufficiency of the evidence. *Brooks v. State*, 323 S.W.3d 893, 896 (Tex. Crim. App. 2010). When reviewing the legal sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 320; *Brooks*, 323 S.W.3d at 896.

In order to prove its case beyond a reasonable doubt, the State was required to show that Appellant intentionally or knowingly caused Anderson's death. TEX. PENAL CODE § 19.02. It is well-settled that circumstantial evidence alone can be

---

interrogation." (RR11: 64).

22

sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "And while juries are permitted to draw multiple reasonable inferences, as long as each inference is supported by the evidence presented at trial, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth, 2014), *citing Megan Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013).

The only "evidence" that Appellant caused Anderson's death intentionally or knowingly came from Detective White who gave his opinion, unsupported by any personal knowledge, that Appellant acted intentionally or knowingly.[3] As discussed above, this "evidence" should have been excluded at trial and should not be considered on appeal. *See Fairow*, 943 S.W.2d at 900. Without Detective White's testimony, the State failed to show Appellant intentionally or knowingly caused Anderson's death, and any speculation to that effect is not supported by the record. In fact, the record evidence shows that when Appellant returned home from work on November 15, 2012, he called 911 and performed CPR on Anderson until EMS arrived.

---

[3] Again, Appellant anticipates that the State will argue Appellant confessed to intentionally causing Anderson's death based on statements Appellant made during his third interview with White. *See* (RR11: 64, 68). However, the record reflects that Appellant's statements regarding what could have happened on the night Anderson died were speculation and "for the sake of this interrogation." (RR11: 64).

23

In the absence of any evidence to show Appellant's mental state, or that he acted intentionally or knowingly, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 320; *Brooks*, 323 S.W.3d at 896. Accordingly, Appellant's third point of error should be sustained.

## IV. *The prosecutor unfairly exceeded the proper areas of jury argument during closing statements which resulted in a substantial violation of Appellant's rights, including the right to a fair trial.*

Appellant's fourth point of error should be sustained because the prosecutor exceeded the proper areas of jury argument, over Appellant's objection, during closing arguments. The prosecutor's argument harmed Appellant and resulted in a violation of his substantial rights, including his right to a fair trial.

It is well-settled that there are four proper areas of jury argument: (1) summation of the evidence, (2) reasonable deductions drawn from the evidence, (3) answer to opposing counsel's argument, and (4) plea for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). "An argument which exceeds these bounds is error…" and is subject to reversal if the argument is extreme or manifestly improper, violative of a mandatory statute "or injects new facts, harmful to the accused, into the trial." *Felder v. State*, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992), *citing Bell v. State*,

24

724 S.W.2d 780 (Tex. Crim. App. 1986); *Cannon v. State*, 668 S.W.2d 401 (Tex. Crim. App. 1984).

During closing arguments at the guilt or innocence phase of trial, the following occurred before the jury:

THE PROSECUTOR: Ladies and gentlemen, I want you to come with me to that -- to Kirstin's home, to that address at Little John where she lived. I want you to come with me to that night of November 14th and I want us to walk into her bedroom and see what is going on there. And I want you to see as the defendant strikes her and as she decides on that night she has had enough, she's going to kick him out --

TRIAL COUNSEL: Your Honor, she is arguing facts that have not been entered into evidence.

THE PROSECUTOR: Your Honor, it is a deduction from the evidence based on the defendant's statements.

THE COURT: Objection overruled.

THE PROSECUTOR: So she decides -- she has decided she's had enough, she's not going take it anymore, she is

going to call the police. That's what caused all of this to happen, she was finally going to take some action.

TRIAL COUNSEL: Your Honor, I renew my objection. This is not a deduction from the evidence. This is pure hypothetical being offered by the State, not based on any evidence that's been admitted.

THE COURT: Objection overruled.

(RR10: 23-24). The prosecutor continued her argument, which injected new facts, harmful to Appellant, as follows:

THE PROSECUTOR: I want you to indulge me for a few seconds. I'm going to start this stopwatch that I have here and when I start it I want all of us to hold our breath, and when I stop it, for as long as you can or until I say stop because I want to show you how long this takes to kill someone, why it is intentional.

TRIAL COUNSEL: Your Honor, I object to this as well. This is outside the scope of the evidence that was presented.

THE COURT: Objection overruled.

26

THE PROSECUTOR: If we could start. If we could stop. That's only 14 seconds. Kirstin is still not dead. He's continuing to choke her to unconsciousness. She is still not dead and we're at 30 seconds. Imagine how long it took. Think about that damage to her cartilage, he fractured it, the pressure that is required. 40 seconds, we're still not there. She's still not dead. Can you imagine the fear? Can you imagine what she's feeling? She can't breathe. That gentleman who was on the jury told us when his wife has those attacks, when she can't breathe --

TRIAL COUNSEL: Your Honor, I object that that is not evidence that was offered in trial.

THE PROSECUTOR: -- the moment has to pass before she can breathe.

THE COURT: Again, the ladies and gentlemen of the jury will recall the evidence as they heard it.

THE PROSECUTOR: Those of you that are nurses, that work -- that are on the jury that work with patients that have

27

problems with their airway --

TRIAL COUNSEL: That's improper jury argument, Your Honor.

THE PROSECUTOR: -- use your experience.

TRIAL COUNSEL: I object, Your Honor. She cannot appeal directly to the individual jurors in that manner. I object that that is improper jury argument.

THE PROSECUTOR: Use your personal experience. Think about that.

TRIAL COUNSEL: Your Honor, could I get a ruling on my objection?

THE COURT: I'm reading what she said. The objection regarding the nurses is sustained. The jury will disregard that remark.

TRIAL COUNSEL: Your Honor, I ask for them to strike that and I move for a mistrial.

THE COURT: Motion denied.

THE PROSECUTOR: Think about that. All this time about the airway that we've been talking and Kirstin is still not dead. We're only at a minute and 54 seconds.

(RR10: 26-27). The prosecutor continued:

THE PROSECUTOR: No one would choose the death that Kirstin

28

suffered, beaten. Even Dr. Wood told you about those injuries on the top of her head where she saw internal hemorrhaging. She talked about how the muscles in her neck, there was hemorrhaging along the muscles along with that fractured thyroid cartilage, the injuries underneath the temple that was hemorrhaging underneath. This is an intentional act and all of this happened because Kirstin was going to call the police, because she was going to free herself from this man. And think about it, even in the first scenario when I asked you to indulge me, think about it. After only a few seconds when we start breathing again, it's a good feeling, but imagine the panic when you can't control it, you can't what is causing the pressure off your neck, you are fighting for your life. Imagine those final moments of Kirstin's life, what that must have been like.

TRIAL COUNSEL:     Your Honor, I object to -- the medical examiner

29

|  | testified that those are not the causes of her injuries -- that that was not the cause of her death. It was not the tracheal injuries. |
| THE COURT: | The ladies and gentlemen will recall the evidence as they heard it. |

(RR10: 32-33).

There was never any testimony that Anderson was going to call the police or what her mental state was prior to her death. Further, as counsel correctly pointed out, tracheal injuries did not cause Anderson's death, as proffered by the prosecutor. Finally, there was no evidence as to how long Anderson was deprived of air, in stark contrast to the prosecutor's assertion, complete with a stopwatch. The prosecutor's arguments were outside the bounds of proper jury argument and undoubtedly injected new facts, harmful to Appellant, into the trial. *See Felder*, 848 S.W.2d at 94-95.

Appellant was harmed by these arguments because his substantial rights, including his right to a fair trial, were affected by the trial court's ruling. TEX. R. APP. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997), *citing Kotteakos v. United States*, 328

U.S. 750, 776 (1946). Clearly, when the prosecutor stood before the jury and attempted to fill in the gaps of the State's case by interjecting nothing more than speculation, the jury's verdict was affected which necessarily impacted the outcome of Appellant's trial. *See King*, 953 S.W.2d at 271.

The prosecutor's arguments exceeded the proper bounds of jury argument which resulted in a violation of Appellant's substantive rights. *See Felder*, 848 S.W.2d at 94-95; *King*, 953 S.W.2d at 271. Therefore, Appellant's fourth point of error should be sustained.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court reverse the judgment and sentence in this case.

Respectfully submitted,

_____"/s/" Kristen Jernigan_____
KRISTEN JERNIGAN
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 931-3650 (fax)
Kristen@txcrimapp.com

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Appellant's Brief has been mailed to the Travis County District Attorney's Office, P.O. Box 1748, Austin, Texas 78767, on April 23, 2015.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing document consists of 5,865 words in compliance with Texas Rule of Appellate Procedure 9.4.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan